# IN RE APPEAL OF MOWER.

PATENTS; ABANDONMENT; EQUITABLE ESTOPPEL.

1. Where after a reduction to practice of an invention an applicant delays for eleven years the filing of his application in order to keep it from the public and in order to prevent his partners from obtaining any benefit therefrom, and in the meantime, and three years before the filing of his application, third parties obtain a patent for the same invention and put it into extensive operation, such applicant will be deemed to have abandoned his invention and will not be entitled to a patent.

2. While under Sec. 4886, R. S. U. S., there can be no abandonment of the right to a patent unless such abandonment be affirmatively proved, such proof may be furnished by evidence of acts and conduct showing a deliberate and intentional delay in applying for a patent such as to prejudice the rights of the public and third parties. The presumption of abandonment can not be overcome merely by a denial of an intention to abandon.

Patent Appeals. No. 115. Submitted May 9, 1899. Decided June 6, 1899.

HEARING on an appeal from a decision of the Commissioner of Patents rejecting an application for a patent. *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. Frederick P. Fish, Mr. W. K. Richardson* and *Mr. F. L. Emery* for the appellant.

*Mr. W. A. Megrath* for the Commissioner of Patents.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

This appeal is taken from a decision of the Commissioner of Patents, refusing to grant a patent to the appellant, Samuel E. Mower, or to his assignee, upon an application

filed in the Patent Office May 14, 1894. In that application it is alleged that the applicant Mower is the original and first inventor of certain new and useful improvements in loading mechanism for apparatus for driving fastenings. The application was put in interference with a patent previously issued to Crisp and Copeland, June 30, 1891, for a similar invention.

The examiner of interferences found, and so declared, that Mower was in fact the prior inventor; but he was of opinion that a patent to Mower should be refused for the reason that he had abandoned the invention, and he therefore recommended that the patent applied for be refused. Subsequent to this decision and recommendation of the examiner of interferences, by agreement of counsel, the interference proceeding was suspended, and the matter of Mower's abandonment was referred to the primary examiner for determination. That examiner was of opinion that Mower or his assignee had abandoned the invention, and rejected the application for that reason. From that decision an appeal *ex parte* was taken to the board of examiners in chief, and the decision of the primary examiner was reversed; and thereupon the interference was resumed or reinstated, and an appeal from the decision of the examiner of interferences was taken by Crisp and Copeland on the question of priority awarded in favor of Mower and his assignee, to the board of examiners-in-chief, and the decision appealed from was affirmed. Whereupon an appeal was taken by Crisp and Copeland to the Commissioner in person, assigning as one of the grounds of appeal, that there was error in the decision appealed from in not holding that the invention of Mower had been abandoned; and, as a second error, in awarding priority of invention to Mower.

On this latter appeal, the Commissioner, while he affirmed the decision of the examiners in chief upon the question of priority, yet he held that Mower was not entitled to a patent. The patent was accordingly refused, and thereupon Mower

15 Ct. App.—11

took an appeal *ex parte* to the examiners in chief from the decision of the primary examiner; and the examiners in chief, on that appeal, say:

"We find the facts in the *ex parte* case which is now before us to be the same as those indicated by the Commissioner in his aforesaid decision, and upon the authority of said decision do hereby affirm the rejection of the lower tribunal."

From this decision an appeal *ex parte* was taken by Mower to the Commissioner in person; and after going over and reviewing the facts a second time, he adhered to his former ruling; and after citing the decision of this court in *Mason* v. *Hepburn*, 13 App. D. C. 86: 84 O. G. 147, he said: "What little hesitation I had in coming to the conclusion in the interference that Mower had abandoned his invention is removed by the authority last cited." And he accordingly affirmed the decision of the examiners in chief. It is from that decision that this appeal is taken.

The proceedings in the Patent Office were much involved and complicated; but the necessities of this case do not require a more detailed statement of such proceedings than we have made.

In regard to the facts relating to the Mower invention, and the circumstances under which the application was made for a patent thereon, the Commissioner, in his opinion, found and declared as follows:

"The proofs show that after such tests were made in 1882–3 the exhibit machine was laid aside for some eleven years. Meanwhile Crisp and Copeland conceived the same invention, reduced it to practice, applied for and obtained a patent, and placed the invention upon a large scale on the market, and the public, through them, acquired knowledge of the invention and the right to use the same, some four hundred machines being put on the market by their assignees before Mower took any steps to obtain a patent or put the invention into use. It was not until the Crisp and Copeland patent had been issued for nearly three years, and

the machines had been placed upon the market for nearly two years in New England, where Mower lived, that the Mower application was filed. Even then neither Mower nor Henry G. Thompson, who claimed to be the equitable, if not the legal, owner of the invention, took any steps to apply for a patent; but the initiative was taken by one Hurd, the agent of a corporate rival of the corporation owning the Crisp and Copeland patent, who obtained from Mower, through Thompson, the execution of an application by Mower and its assignment to such corporation. It will be seen that the invention in controversy was not given to the public by Mower, but by Crisp and Copeland."

The counsel for the respective parties concerned on this appeal, for the purpose of simplifying the case, and reducing the volume of the record, have agreed upon a statement of facts, which we shall recite at large and which is as follows:

"Applicant Mower conceived the invention of his application, filed May 11, 1894, Serial No. 511,089, in the spring of 1881; made working drawings shortly thereafter, and completed a full-sized loading machine, containing said invention, in the summer of 1881, said machine being referred to as 'Mower's Exhibit Loading Machine.'

"This machine was tested for the first time, immediately on its completion, in the summer of 1881; slight changes were made; it was again tested in July, 1882, and again in the summer of 1883. The tests of the machine in 1882 and in 1883 were both conducted in shoe factories, openly and where they could be seen by anyone who was in the factory at the time, and were for the purpose of testing it (the machine) as to its capacity and practicability for doing the work for which it was built. The tests were entirely satisfactory.

"Mower's said machine of 1883 was a full and complete reduction to practice of his invention, and it was publicly and successfully tested in shoe factories, where it was operated sufficiently to show that it was a completed invention, capable of satisfactory use in practical work.

"The Crisp and Copeland patent, No. 455,174, was issued nearly three years prior to the date of filing of the appellant Mower's application, and Crisp and Copeland had put out some four hundred of their machines prior to said date of filing of Mower's application. Substantially all of said Crisp and Copeland machines were put out within the year immediately previous to the date of filing Mower's said application.

"The invention in controversy had not been in public use or on sale in this country for more than two years prior to the filing of Mower's application."

On this state of facts, Mower and his assignee seemed to have deemed it necessary to offer explanation of the great delay that had occurred in making the application for the patent; and, indeed, we do not understand it to be seriously contended, that, without sufficient explanation of that delay, their application would be entitled to favorable consideration. For the purpose, therefore, of explaining the reason and the motive for the delay, Henry G. Thompson, the owner of the Mower invention and application, filed an affidavit of himself, and one made by his son, H. G. Thompson, Jr. It will suffice for the purposes of this case to state only the parts of those affidavits that set forth the reason for the delay, omitting the extended narrative of facts relating to the business affairs of the parties. It is proper, however, to premise that Mower was superintendent in the shop of Thompson & Son, and that the latter had become owner of the Mower invention, and controlled it exclusively; but Thompson, Sr., owned other patented inventions of a kindred nature to that of Mower's invention, and which he was using in his business.

In his affidavit he states: "About the year 1874 I became very much interested in the matter of lasting boots and shoes by machinery, and devoted a great deal of attention to the development of machinery for this purpose, and, with Samuel E. Mower, then in my employ, obtained Letters Patent of the United States, No. 251,487, dated December

27, 1881, for an improvement in lasting machines. I also acquired an interest in other United States letters patent obtained by said Moyer and others, for lasting machines, and various accessories required in connection with lasting machines, and in 1876 I organized what was then known as the Magnetic Lasting Machine Association for the control of the manufacture and introduction of the lasting machines and accessories covered by the patents which I then controlled or was interested in."

After a long detailed statement of his business relations and affairs with others, he states that he had contracted for and had constructed some fifty or more lasting machines, at a large cost, and which machines he was desirous of holding until the expiration of certain patents, and then disposing of them, before going into the Patent Office with the Mower invention. He says: "Being unable to do anything with the lasting-machines on my hands because of the fact that I was tied up with the McKay & Thompson Consolidation Association, and realizing that I could do nothing further until my patents, which I had assigned to said association, had expired, I devoted my principal attention to my legitimate business, although, as before stated, I frequently discussed the matter of this loading mechanism with my son."

In the conclusion of the affidavit, Thompson, Sr., says: "I did not know that others than Samuel E. Mower had patented a similar loading mechanism until the time when I was called upon for Mower's patent on the same, as above stated. I had all along supposed that Mr. Mower was the only party who had ever devised a loading mechanism, such as before referred to, and I also supposed that I had all along been in the exclusive possession of the said loading mechanism and the invention which it contained, otherwise I should have made some effort to dispose of the lasting-machines on my hands in some other way, for the longer they were held, I having no protection to enable me to ultimately put them on the market, the greater would

be the financial loss or sacrifice to me. It was never my intention to surrender the loading mechanism herein referred to, and the invention which it contained, either by abandonment or by dedication to the public. On the contrary, I had always held said mechanism and invention with one end in view, viz., to patent it in season to protect me in putting out my fifty lasting machines when the patents thereon had expired."

And in the affidavit of the son, H. G. Thompson, Jr., the same facts are substantially stated. He says that his father, at the time referred to, "considered the loading mechanism an essential accessory to the commercial use of his (the Thompson) lasting machines, which were then lying idle at Pratt & Whitney's, and thought that by covering the loading mechanism by letters patent he could thereby control the lasting machines or the use of the same. During the subsequent period of time until he caused application for patent on the said loading mechanism to be filed (viz., on the 14th of May, 1894), he frequently referred to the matter of this loading mechanism in conversation with me, and he invariably stated that he was going to put his lasting machines on the market as soon as the patents covering the same should expire, and that he was going to patent Mower's loading mechanism just previous to the expiration of the lasting machine patents, so as to enable him to recover, as far as possible, the money which he had locked up in those lasting machines. From my father's conversation with me I know he never contemplated abandoning the loading mechanism referred to, but that he constantly had in mind the ultimate patenting of said loading mechanism in order that he might avail himself of the patent in the manner above referred to. I further know that it was the understanding among the members of the firm and with Samuel E. Mower that the above was the reason why my father did not earlier apply for the patent on said loading mechanism."

Now, the question is, whether the facts and the reasons thus furnished by these affidavits for the delay and withholding of the application for a patent for the Mower invention, are good and available to remove and overcome the objection of laches and the want of due diligence on the part of the applicant, as against the public, and the rights of third parties who have, as independent inventors, duly conceived and perfected the invention of the device covered by the pending application, and applied for and obtained a patent thereon, near about three years before the present application was filed? The tribunals of the Patent Office, as we have seen, with all the facts before them, have held, that neither Mower nor his assignee was entitled to a patent for the invention of Mower; and in that conclusion this court fully concurs. The attempted explanation, by the facts set forth in the affidavits, of the great delay that was allowed to occur, really amounts to no excuse or justification whatever, for the want of diligence in making the application. It is not pretended that the delay occurred by reason of any oversight or inadvertence, or from poverty, or any obstacle that could not easily be overcome. On the contrary, the withholding of the application was due entirely and exclusively to a fixed and determined purpose on the part of the owner of the invention to keep it from public use, and to prevent his partners from obtaining any benefit therefrom, until the expiration of certain patents, and he could find it profitable to dispose of certain lasting machines that he had on hand. Or, as stated in the affidavit of the son, the father " was going to put his lasting machines on the market as soon as the patents covering the same should expire, and that he was going to patent Mower's loading mechanism just previous to the expiration of the lasting-machine patents, so as to enable him to recover, as far as possible, the money which he had locked up in those lasting machines."

To say the least of the matter, there was not much consideration given to the public in this scheme of delay,

however much it may have inured to the benefit and advantage of the owner of the invention.

But in the meantime, of this long delay of about eleven years, third parties, subsequent and independent inventors of the same device, came into the office with their completed invention, applied for and obtained a patent, at large cost and trouble, and have put the invention into operation and given the public the benefit of it; and the effort now is to defeat this patent of three years' standing, and to cause it to be retired and to give place and operation to a patent sought to be obtained upon a completed invention made more than eleven years before application filed in the Patent Office. To grant this application would neither be equitable nor just in any proper sense of those terms; nor would it be promotive of the great object of the patent laws. It has been declared by the Supreme Court, in the case of *Bates* v. *Coe*, 98 U. S., 31, 46, that "inventors may, if they can, keep their inventions secret, and if they do for any length of time they do not forfeit their right to apply for and obtain a patent, unless another in the meantime has made the invention and secured by patent the exclusive right to make, use, and vend the patented improvement. Within that rule and subject to that condition, inventors may delay to apply for a patent."

This, doubtless, is a correct general proposition; but, like all general propositions, it may have its exceptions under special and particular circumstances, even where the intervening rights of third parties have not been secured by patent.

The patent laws are founded in a large public policy to promote the progress of science and the useful arts. The public, therefore, is a most material party to, and should be duly considered in, every application for a patent, securing to the individual a monopoly for a limited time, in consideration for the exercise of his genius and skill. But the arts and sciences will certainly not be promoted by giving

encouragement to inventors to withhold and conceal their inventions for an indefinite time, or to a time when they may use and apply their inventions to their own exclusive advantage, irrespective of the public benefit, and certainly not if the inventor is allowed to conceal his invention to be brought forward in some after time to thwart and defeat a more diligent and active inventor, who has placed the benefit of his invention within the reach and knowledge of the public.   In withholding the invention, after its completion and when a patent could be obtained therefor, for an undue and unreasonable time, and until after other inventors have, by their skill and ingenuity, perfected a similar invention and obtained a patent therefor, the first or original inventor shows himself to be unmindful of both the public and individual rights.   And one of the reasons why the statute has confided such large powers to the Commissioners of Patents, in refusing a patent, is to prevent such abuse.   In section 4893, United States Revised Statutes, it is provided that "on the filing of any such application and the payment of the fees, etc., the Commissioner of Patents shall cause an examination to be made of the alleged new invention or discovery; *and if on such examination it shall appear that the claimant is justly entitled to a patent under the law,* and that the same is sufficiently useful and important, the Commissioner shall issue a patent therefor."

The invention claimed must not only be shown to be new and useful, but it must also be made to appear that the claimant *is justly entitled* to a patent therefor.   The party can not be justly entitled, if the patent when granted would· or could operate a wrong either to the public, or to a third party, a rival inventor, and· that wrong be the result of the claimant's own *laches* or negligent delay in asserting his rights.

But it has been earnestly argued for the appellant, that, by section 4886, United States Revised Statutes, there can be no abandonment of the right to a patent, unless such

abandonment *be affirmatively proved*, and that there is no such proof in this case; and that, unless the right be abandoned, neither the Patent Office nor the courts can withhold the patent from the original or first inventor.    This, as a general proposition, may well be conceded; but the question as to the proof of abandonment is quite another thing.    Affirmative facts may be proved by negative evidence; and where the acts and conduct of a party are of such nature as to give rise to a rational presumption of a fact, that presumption, after the rights of other parties have intervened and attached, can not be removed and gotten rid of, by simply denying the intention to produce the result.    Parties must be bound by the consequences of their own acts, and this principle is true in the patent law as it is in all other departments of the law.    A deliberate intentional delay and non-action, in a matter of either a public or private concern, is proof of a very cogent nature ; and the party chargeable with such conduct must bear the consequences of it, and will not be heard to excuse himself by simply declaring that he did not intend to prejudice the rights of others, or to waive rights of his own, that would have been available to him, if they had been timely exercised.    The doctrine of equitable estoppel applies in the administration of the patent law, as it does in other cases, for the prevention of injustice.    The Supreme Court, in the case of *Consolidated Fruit Jar Co.* v. *Wright*, 94 U. S. 92, 96, in considering a question of abandonment in a patent case, said :

"It is enough to say, without recapitulating the facts, that in our judgment the defense of abandonment to the public is also clearly made out.    He who is silent when he should speak must be silent when he would speak, if he can not do so without a violation of law and injustice to others.    The supineness of the patentee is unexplained and inexcusable.    A principle akin to the doctrine of equitable estoppel applies."

The relation and duty of an inventor to the public, and

to third parties who may subsequently invent and apply for, and obtain a patent that embraces the same invention as that of the first inventor, is well and forcibly stated in the opinion of the Supreme Court of the United States, in the case of *Kendall* v. *Winsor*, 21 How. 322, 328. In that case one of the questions was, whether an inventor who forebore to apply for a patent intended negligently to postpone his claims to a patent for purposes of his own personal advantage; and the court, by Mr. Justice Daniel, said:

"It is undeniably true, that the limited and temporary monopoly granted to inventors was never designed for their exclusive profit or advantage; the benefit to the public or community at large was another and doubtless the primary object in granting and securing that monopoly. This was at once the equivalent given by the public for benefits bestowed by the genius and meditations and skill of individuals, and the incentive to further efforts for the same important objects. The true policy and ends of the patent laws enacted under this Government are disclosed in that article of the Constitution, the source of all these laws, viz., 'to promote the progress of science and the useful arts,' contemplating and necessarily implying their extension, and increasing adaptation to the uses of society. By correct induction from these truths, it follows, that the inventor who designedly, and with the view of applying it indefinitely and exclusively for his own profit, withholds his invention from the public, comes not within the policy or objects of the Constitution or acts of Congress. He does not promote, and, if aided in his design, would impede the progress of science and the useful arts. And with a very bad grace could he appeal for favor or protection to that society which, if he had not injured, he certainly had neither benefited nor intended to benefit. Hence, if, during such a concealment, an invention similar to or identical with his own should be made and patented, or brought into use without a patent, the latter could not be inhibited nor restricted, upon proof

of its identity with a machine previously invented and withheld and concealed by the inventor from the public. The rights and interests, whether of the public or of individuals, can never be made to yield to schemes of selfishness or cupidity; moreover, that which is once given to or is invested in the public, cannot be recalled nor taken from them.

"But the relation borne to the public by inventors, and the obligations they are bound to fulfil. in order to secure from the former protection, and the right to remuneration, by no means forbid a delay requisite for completing an invention, or for a test of its value or success by a series of sufficient and practical experiments; nor do they forbid a discreet and reasonable forbearance to proclaim the theory or operation of a discovery during its progress to completion, and preceding an application for protection in that discovery. The former may be highly advantageous, as tending to the perfecting of the invention; the latter may be indispensable, in order to prevent a piracy of the rights of the true inventor."

The case just quoted from has been treated as a leading one, and often cited with approval both in the opinions of the Supreme Court, and those of the Circuits Courts of the United States; and the doctrine therein laid down may be regarded as well settled.

This case was well considered by the tribunals of the Patent Office, and especially so in the two opinions written by the Commissioner of Patents. Indeed, the case could well have been disposed on the present appeal upon the reasoning and authorities presented in the opinion of the Commissioner. There is but one other case to which we desire to refer, as having a special application to the facts of this case, and that is *Consolidated Fruit Jar Co.* v. *Wright*, 12 Blatchf. C. C. 149. The reasoning of Judge Woodruff in that case has special force and application in the present.

It follows that the decision of the Commissioner of Patents must be affirmed; and the proceeding and opinion of the

court are hereby directed to be certified to the Commissioner of Patents in accordance with the requirement of the statute.

*Decision affirmed.*